UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| TONYA J.,[1]<br><br>                    Plaintiff,<br><br>        vs.<br><br>ANDREW W. SAUL, Commissioner,<br>Social Security Administration,<br><br>                    Defendant. | CIV. 19-5024-JLV<br><br>REDACTED<br>ORDER |

## INTRODUCTION

Plaintiff filed a complaint appealing the final decision of Andrew M. Saul, Commissioner of the Social Security Administration, finding her not disabled. (Docket 1).   Defendant denies plaintiff is entitled to benefits.   (Docket 14).   The court issued a briefing schedule requiring the parties to file a joint statement of material facts ("JSMF").   (Docket 16).   The parties filed their JSMF.   (Docket 24).   For the reasons stated below, plaintiff's motion to reverse the decision of the Commissioner (Docket 32) is granted.

---

[1]The Administrative Office of the Judiciary suggested the court be more mindful of protecting from public access the private information in Social Security opinions and orders.   For that reason, the Western Division of the District of South Dakota will use the first name and last initial of every non-governmental person, except physicians and other professionals, mentioned in the opinion.   This includes the names of non-governmental parties appearing in case captions.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 16) is incorporated by reference.   Further recitation of salient facts is incorporated in the discussion section of this order. On March 8, 2012, plaintiff filed an application for disability insurance ("DI") benefits and supplemental security income ("SSI") benefits pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-33, 1381-83f (2006), respectively.   Id. ¶¶ 1-2; see also Administrative Record at pp. 435-49 & 521 (hereinafter "AR at p. ____").   Plaintiff alleged an onset of disability date of January 1, 2007.   (Docket 16 ¶ 2).

On January 24, 2019, an administrative law judge ("ALJ") issued a decision plaintiff was not disabled.   Id. ¶15; see also AR at pp. 21-42.   The Appeals Council denied plaintiff's request for review and affirmed the ALJ's decision. The ALJ's decision constitutes the final decision of the Commissioner of the Social Security Administration.   It is from this decision which plaintiff timely appeals.

The issue before the court is whether the ALJ's decision that plaintiff was not "under a disability, as defined in the Social Security Act, from January 1, 2007, through the date of [January 24, 2019]" is supported by substantial evidence in the record as a whole.   (AR at p. 42) (bold omitted); see also Howard v. Massanari, 255 F.3d 577, 580 (8th Cir. 2001) ("By statute, the findings of the Commissioner of Social Security as to any fact, if supported by substantial

2

evidence, shall be conclusive.") (internal quotation marks and brackets omitted) (citing 42 U.S.C. § 405(g)).

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole.   42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006); Howard, 255 F.3d at 580.   The court reviews the Commissioner's decision to determine if an error of law was committed.   Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).   "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."   Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).   See also Twyford v. Commissioner, Social Security Administration, 929 F.3d 512, 516 (8th Cir. 2019) (same).

The review of a decision to deny benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision."   Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would decide the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial

evidence.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).   A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' "  Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).  Issues of law are reviewed *de novo* with deference given to the Commissioner's construction of the Social Security Act.   See Smith, 982 F.2d at 311.

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to DI benefits under Title II or SSI benefits under Title XVI.   20 CFR §§ 404.1520(a) and 416.920(a).[2]   If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled.   Id.   The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

---

[2]The criteria under 20 CFR § 416.920 are the same under 20 CFR § 404.1520.   Boyd v. Sullivan, 960 F.2d 733, 735 (8th Cir. 1992).   All further references will be to the regulations governing DI benefits, unless otherwise specifically indicated.

4

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).   The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations.   (AR at pp. 23-42).

**STEP ONE**

At step one, the ALJ determined plaintiff had "not [been] engaged in substantial gainful activity since January 1, 2007, the alleged onset date."   Id. at p. 25 (bold omitted).   The ALJ acknowledged plaintiff "worked after the alleged disability onset date but this work activity did not rise to the level of substantial gainful activity."   Id.

Plaintiff objects to the ALJ's finding.   (Docket 33 at pp. 19-21).   Plaintiff alleges the ALJ erred as a matter of law by failing to consider the "potential onset of disability" of February 2003.   Id. at p. 21.   This was the date of disability alleged in plaintiff's first applications for benefits of February 12, 2003.[3] (Docket 24 ¶ 1(A)).   The 2003 date is important in plaintiff's view because Dr. W.'s diagnosis of fibromyalgia was the justification for plaintiff's work stoppage at that time.   (Docket 33 at p. 20) (referencing Docket 24 ¶¶ 17-18).   "Failure to consider Dr. W.'s evidence," according to plaintiff "was harmful because it resulted in forfeiture of potential cash benefits and increased the number of months before Medicare was potentially available to pay for diagnosis and treatment."   Id. at p. 21.   According to plaintiff, "Medicare, 42 U.S.C.A. § 426(b), commences after the five-month waiting period and receipt of 24

---

[3]"These applications were denied at the initial level in September 2003, and reconsideration was not requested."   (Docket 24 ¶ 1(A)).

5

months of Title II payments[.]"   Id. (referencing 42 U.S.C. § 426B(2)(A).   In other words, plaintiff argues she would have been entitled to "benefits for up to 12 months immediately before the month in which [her] application is filed."   Id. (citing 20 CFR § 404.161(a)(1)).

As plaintiff's 2003 application for benefits is not subject to reopening, the Commissioner argues plaintiff's argument lacks merit.   (Docket 35 at p. 8). Because SSI benefits cannot be awarded "prior to the application date" and DI benefits are only payable for "the twelve month period before the month in which you applied," the Commissioner asserts 2003 as a potential onset of disability date is irrelevant.   Id. (referencing 20 CFR §§ 416.335 & 404.315(a)(4)).

Instead, the Commissioner submits "the ALJ utilized the January 1, 2007, alleged onset date Plaintiff specified in her March 2012 applications."   Id. at p. 9.   According to the Commissioner "[t[he period ruled upon fully encompasses and covers the period of time covered by Plaintiff's applications."   Id.   The Commissioner reminds the court the January 1, 2007, date is within the threshold period of "December 31, 2007," plaintiff's "last insured" date for DI benefits.   Id.

In reply, plaintiff contends she is not requesting to reopen her 2003 application.   (Docket 36 at p. 7).   Instead, plaintiff argues the failure of the ALJ to consider "the 2003-05 evidence in Exhibits 16F ([Docket 16 at p.] 22) and 32F

([Docket 16 at pp.] 23-29)" is "contrary to the Appeals Council remand order and Judge Schreier's [remand] order."[4]  <u>Id.</u> at p. 8.

Social Security Ruling ("SSR") 18-01P provides, in part:

> [W]e start by considering whether we can establish the EOD [established onset date] as of the claimant's potential onset date (POD) of disability.   The POD is the first date when the claimant met the non-medical requirements during the period covered by his or her application.   The POD is the earliest date that we consider for the EOD because it affords the claimant the maximum possible benefits *for the period covered by his or her application.*   The POD may be the same as, earlier than, or later than the claimant's alleged onset date, which is the date that the claimant alleges he or she first met the statutory definition of disability.

SSR 18-01P, 2018 WL 4945639, at *3 (Oct. 2, 2018) (emphasis added).

In this case, plaintiff's declared alleged date of disability is January 1, 2007.   While generally compelling an ALJ to look further back in time to consider a POD may be of assistance in later parts of the five-step analysis, i.e., determining claimant's credibility, insisting the ALJ in this case look back to 2003 is not necessary.   Contrary to plaintiff's argument and as will be discussed further in this order, the ALJ did consider Dr. W.'s diagnosis of fibromyalgia as endorsed by subsequent medical care providers.   *Compare* Docket 24 ¶¶ 18-19 & 22 with 23-24, 26-30 & 32-34.

---

[4]<u>See</u> Order of Appeals Council and Memorandum Opinion and Order Reversing the Decision of the Commissioner, <u>Jockish v. Colvin</u>, CIV. 15-5011 (D.S.D. 2016).   (AR at pp. 15-17 & 109-126).   Because "the administrative order is replete with inconsistency regarding the appropriate spelling of plaintiff's last name [and] the ALJ and the parties have utilized "Jockish," the court will do so as well."   (AR at p. 109 n.1).

The ALJ's acceptance of January 1, 2007, as plaintiff's onset date of disability is a decision supported by good reason and is based on substantial evidence.   Guilliams, 393 F.3d at 801.   Plaintiff's objection to the ALJ's step one finding is overruled.

### STEP TWO

At step two, the ALJ must decide whether the claimant has a medically determinable impairment that is severe or a combination of impairments that are severe.   20 CFR § 404.1520(c).   A medically determinable impairment can only be established by an acceptable medical source.   20 CFR § 404.1513(a). Accepted medical sources include, among others, licensed physicians.   Id.   "It is the claimant's burden to establish that his impairment or combination of impairments are severe."   Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007).

The regulations describe "severe impairment" in the negative.   "An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities." 20 CFR § 404.1521(a).   An impairment is not severe, however, if it "amounts to only a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."   Kirby, 500 F.3d at 707. Thus, a severe impairment is one which significantly limits a claimant's physical or mental ability to do basic work activities.

The ALJ identified plaintiff suffered from the following severe impairments:

From January 1, 2007 through [January 24, 2019], the claimant has the following severe impairments:

8

> fibromyalgia, chronic fatigue syndrome, osteoarthritis
> of the spine and right hip, and trochanteric bursitis.
>
> From October 28, 2013 through October 25, 2016, the claimant had
> the following additional severe impairments:
>
> depressive disorder and anxiety/panic disorders.

(AR at p. 25) (bold omitted; reformatted for convenience).

Plaintiff objects to the ALJ's step two ruling.   (Docket 33 at pp. 24-31). She believes the ALJ failed to consider that "[a] number of physicians . . . expressed opinions about the brain MRIs . . . showing a persistent 8 mm. left-side periventricular white matter lesion."   Id. at p. 25 (referencing Docket 24 ¶¶ 25, 42-43, 47 & 65 and AR at pp. 1246 & 1243).   While a number of the physicians early in plaintiff's treatment noted the white matter lesion was normal, plaintiff submits later neurologists found the lesion abnormal but "lack[ed] . . . a definite diagnosis."   Id. (referencing Docket 24 ¶¶ 44-45).   As a result, plaintiff contends the record shows in "December 2009[,] Dr. S. [a neurologist] . . . had no explanation for [plaintiff's] attacks of weakness lasting hours two or three times a week, chronic aching pain and fatigue, right body paresthesias, unsteady gait and balance."   Id. (referencing Docket 24 ¶ 47).

Plaintiff argues that "[i]n February 2012, [another physician] compared a third brain MRI to the prior MRIs [and noted] [t]he 8 mm area . . . persisted unchanged."   Id. (referencing Docket 24 ¶ 65).   Because plaintiff's conditions persisted, she was referred to Dr. T.H. for a "neuropsychological evaluation."   Id. at p. 27.

9

"Given the three MRIs showing persistent left periventricular white matter disease, the concerns evidenced by [a neurologist, a radiologist and a physiatrist,] and signs, symptoms and limitations consistent with the now-known manifestations of white matter disease,"[5] plaintiff argues "the ALJ was obliged to develop the evidence by requesting a medical explanation by an expert in white matter disease[.]"  Id. at p. 30.   Plaintiff submits "[t]he ALJ's failure to develop the evidence prevented proper consideration of neuropsychological test results in combination with other mental impairments, fibromyalgia, chronic fatigue symptomatology, and impairments of gait and balance."  Id. at pp. 30-31.   For these reasons, plaintiff contends the ALJ's step two ruling is not "supported by substantial evidence."  Id. at p. 31.

The Commissioner contends "[t]he single, small nonspecific lesion does not support Plaintiff's references to 'white matter lesions,' nor does it support Plaintiff[']s lay supposition that she suffers from 'white matter disease.' " (Docket 35 at p. 12) (internal reference omitted).   The Commissioner submits a closer review of the MRIs disclose "[n]ot every abnormality is either a medically determined impairment or a severe impairment."   Id.   Whether considered "probably normal" or abnormal, the Commissioner argues "the abnormality was stable. . . . [And that] [w]ork-up did not result in a finding that the abnormality was clinically significant."  Id. at pp. 12-13 (referencing Docket 24 ¶¶ 45 & 47).

_____

[5]The court takes notice of plaintiff's summary of white matter disease medical literature and a district court decision entered after the ALJ's decision was filed.   (Docket 33 at pp. 27-30).

In conclusion, the Commissioner asserts "[t]he evidence of record does not support Plaintiff's supposition that the abnormality noted in the 2005 MRI was a severe impairment, or that it resulted in either functional limitations, or functional limitations that exceeded the limitations the ALJ specified in her RFC finding." Id. at p. 13.

In reply, plaintiff argues the "Commissioner cannot rely on a radiologist's 2005 statement that the white matter lesion was 'probably normal' . . . where a neurologist said . . . the 2009 and 2005 brain MRI findings were similar and 'abnormal' . . . and the ALJ did not resolve the disagreement of the experts." (Docket 36 at p. 9) (referencing Docket 24 ¶¶ 25 & 44 and Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) ("When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions.").

The ALJ found that "[c]urrent diagnostic tests, including an EMG, an MRI scan of the brain . . . were normal." (AR at p. 31). The parties acknowledge "Dr. C.'s December 2011 EMG/NCV exam was normal." (Docket 24 ¶ 63). "On February 3, 2012, a brain MRI was compared to [2005 and 2009] . . . MRIs. The small area [lesion] . . . was unchanged." Id. ¶ 65. The physician's impression found "[n]o specific change dating back to 2005. Small nonspecific white matter lesion . . . otherwise normal MRI of the brain." Id. Subsequent to the three MRIs, none of plaintiff's physicians raised an issue of correlation between her physical condition and the white matter lesion.

11

The physiatrist, "Dr. C., assessed fibromyalgia and chronic pain syndrome." Id. ¶ 68.   Similarly, in October 2012, "Dr. V.E. assessed chronic fatigue, fibromyalgia, chronic pain syndrome, depression with anxiety, and migraine headache." Id. ¶ 87.   On August 22, 2013, in a follow-up examination of plaintiff, Dr. C. identified the following relevant diagnoses:

> 1.   Hemiplegia, Unspecified, Affecting Dominant Side (Right). . . .
>
> 3.   Myopathy, Unspecified- referral to neurology to work up proximal muscle weakness - trouble with use of arms overhead, swallow, chewing fatigue, trouble walking upstairs, no diplopia but vision "trouble." . . .
>
> 5.   Multiple Sclerosis . . . Note to Imaging Facility: MRI Brain, C-Spine, T-spine - evaluate for MS, right hemibody numbness, weakness, bilateral lower extremities.
>
> 6.   Muscle Weakness, Generalized. . . .

Id. ¶ 97.

Following the "August 2013 MRI," Dr. S. charted the test "did not explain the right-sided symptoms: the small spot adjacent to the right lateral ventricle [the lesion] would not correlate to that." Id. ¶ 104.   Dr. S. did not recommend any further "neurologic" testing but only "neuropsychometric testing." Id. ¶ 107.

There is nothing in the record which would suggest to the ALJ that further attention needed to be given to the white matter lesion.   The ALJ is not "required to order medical examinations and tests" if the medical records do not support the need for further testing.   Johnson v. Astrue, 627 F.3d 316, 320 (8th Cir. 2010).

Plaintiff bears the burden of proof at step two.   Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994) (plaintiff bears the burden of proof at steps one through four of the five-step inquiry).   Plaintiff failed to show the ALJ's findings of medically determinable impairments were not "supported by good reason and [were not] based on substantial evidence."   Guilliams, 393 F.3d at 801.   The ALJ's findings are conclusive because they are "supported by substantial evidence."   42 U.S.C. § 405(g).   The court finds the ALJ did not err at step two of the sequential evaluation.   Kirby, 500 F.3d at 707.

**STEP THREE**

At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1"). 20 CFR §§ 404.1520(d), 404.1525 and 404.1526.   If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR § 404.1509, the claimant is considered disabled.   At that point the Commissioner "acknowledges [the impairment or combination of impairments] are so severe as to preclude substantial gainful activity. . . . [and] the claimant is conclusively presumed to be disabled."   Bowen v. Yuckert, 482 U.S. 137, 141 (1987). Plaintiff has the burden of proof that she meets a listing in Appendix 1. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004).

13

The ALJ determined plaintiff did not have an impairment or combination of impairments which met or were medically equal to one of the impairments listed in Appendix 1. (AR at p. 27). The ALJ gave "specific attention" to Listings 1.02, 1.04, 14.06D and 1409D. Id. As to each of these listings, the ALJ found:

> Listing 1.02 is not met because the claimant has not suffered an inability to ambulate effectively, as evidenced by repeated observations of a normal gait and the claimant's reported activities of daily living . . . .[;]
>
> Listing 1.04 is not met because the claimant has not suffered a significant loss in motor strength, sensation, and reflexes, which is illustrated by a preponderance of the physical examinations, and the record lacks positive straight leg testing, both sitting and supine . . . . [;]
> Listings 14.09D and 14.06D are not medically equaled because the claimant's impairments have not caused a marked limitation in the listed "paragraph B" criteria . . . . [C]laimant's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, and therefore, the "paragraph B" criteria are not satisfied.

Id. at pp. 27-28. The ALJ "conclude[d] the medical evidence does not demonstrate that the claimant's impairments rose to listing level severity and that no acceptable medical source had mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination." Id. at p. 27. The ALJ found "the evidence fails to establish the presence of the 'paragraph C' criteria. The record does not establish that the claimant has only marginal adjustment, that is, a minimal capacity to adapt to changes in the claimant's environment or to demands that are not already part of the claimant's daily life" Id. at p. 28.

14

Plaintiff objects to the ALJ's findings at step three with two separate and distinct arguments.   Those are:

1.   The ALJ fail[ed] to obtain and consider updated mental health counseling reports and post October 2017 medical report[s] . . . adversely impacting on the relative weighing of the treatment evidence.   (Docket 33 at p. 31) (some capitalization omitted); and

2.   The ALJ's step three assessment of "B" criteria was unsupported by substantial evidence, in particular given the ALJ's failure to consider Exhibit 16F, consider the impact of periventricular white matter lesions, and develop the counseling evidence.   Id. at p. 38 (some capitalization omitted).

Each objection will be separately addressed.

OBJECTION 1

A.   Counseling records of J.C.R.

Plaintiff contends only part of the mental health records of Ms. R. were in the administrative record.   (Docket 33 at p. 31).   The included records covered counseling sessions in 2015 through 2016 together with "a detailed medical source statement supported by a narrative account of observations, assessment instruments, and DSM V criteria."   Id. (referencing Docket 24 ¶¶ 268-82). Plaintiff submits "[t]he ALJ had no inkling of the counseling evidence, although it was extensive[.]"   Id. (reference Docket 24 ¶¶ 161-64, 166-72, 178, 181-82, 184-85, 189-90, 193-95, 197 & 200).

Plaintiff argues the information absent from the administrative record is Ms. R.'s counseling notes from July 11, 2016 through November 30, 2018.   Id. at p. 32.   Plaintiff asserts "[t]he AJL unaccountably failed to obtain updated

counseling records." Id.   "For the purpose of showing harmful error," plaintiff attached as Exhibit A to her initial brief the 86 pages of those counseling records. Id. (referencing Docket 33-2).

In plaintiff's view, the ALJ's failure to obtain the up-to-date records from Ms. R. "resulted in strained logic" and several "adverse findings[.]" Id.   Plaintiff identifies those adverse findings as follows:

> [The] ALJ . . . found that [plaintiff] was not involved in counseling after June 2016.   Id. (referencing AR at p 34);
>
> [Plaintiff's] mental [health] impairment had improved to non-severe after June 2016.   Id. (referencing AR at pp. 28 & 36);
>
> [Plaintiff's] testimony before the [2016] ALJ . . . showed that [plaintiff's] impairment had improved to the point that it was non-severe.   Id.;
>
> Robert Pelc, Ph.D., . . . assessed, beginning in early 2015, listing-level mental impairment (marked limitation of social functioning; marked limitation of ability to concentrate, stay on task and persist; . . . and evidence of decompensation in the form of an increase in social avoidance, and a general decline in activities of daily living.   Id. (referencing Docket 24 ¶¶ 286-87); and
>
> Dr. Gilbertson's psychological consultative examination supported [the ALJ's] finding non-severe mental impairment after June 2016. Id. at p. 33.

Plaintiff contends "Dr. Pelc's opinion relied mainly on the two neuro-psychological evaluations and appeared to not give much weight to Dr. T.H.'s reasons for 'inconsistencies.' "[6]   Id. at pp. 32-33.   Further, plaintiff argues "Dr.

---

[6]Plaintiff's argument does not make reference to either the administrative record or the JSMF.   However, the court presumes plaintiff's argument intends to reference Docket 24 ¶¶ 146-159 & 283-289.

Gilbertson's [2018] evaluation was uninformed by medical records or the claimant's written reports, resulting in a review based on a single interview and without any psychological testing."   Id. (referencing Docket 24 ¶ 299).

Plaintiff submits the failure of the ALJ "to obtain and consider all of the records [of Ms. R.] resulted in overvaluation of medical providers' comments about mental functioning."   Id. at p. 33.   Plaintiff argues the ALJ used those overvalued medical providers comments "to rebut Counsellor R.'s mental assessment[.]"   Id.

Plaintiff provided a summary of the reports of "non-counseling evidence" which she argues, contrary to the ALJ's opinion, did not "contradict [Ms. R.'s] evidence."[7]   Id. at p. 34.   See id. at pp. 34-37.   On the missing counseling records issue, plaintiff submits the counselor's

> records . . . delved into the root-source of [plaintiff's] severe psychological problems, repeated childhood sexual trauma perpetrated by [three family members] . . . , coping behaviors–early on, heavy use of alcohol–and, after abstinence, the coping behaviors of extreme avoidance of people, which became part of the psychological problem.

Id. at p. 37 (referencing Docket 24 ¶ 268).

---

[7]While the court will not restate those summaries here, it is important to correct two apparent critical typographic errors in plaintiff's submission.   First, when summarizing the assessment of Dr. C., plaintiff referenced "Exhibit 10F/8."   (Docket 33 at p. 34).   The court believes the reference should be to "Exhibit 10F/18."   Second, under the discussion of Dr. C.'s assessment, plaintiff stated "Dr. C. did say what she meant by 'appropriate mood and affect.' "   Id. at p. 34.   The court believes plaintiff meant to state "Dr. C. did not say what she meant by 'appropriate mood and affect.' "

In response, the Commissioner acknowledges "[t]he counseling records from Ms. R. from July 2016 to November 2018 are not part of the administrative record[.]"   (Docket 35 at p. 14) (referencing Docket 33-2).   The Commissioner submits "[t]he additional counseling records are at most merely cumulative of the earlier records that are part of the administrative record that the ALJ expressly considered."   Id.   The Commissioner asserts "[t]he ALJ explained that Ms. R. [was] not an acceptable medical source . . . [and so] the opinion . . . is not a medical opinion and thus not entitled to any particular or special weight."   Id. at p. 13 (referencing AR at p. 36 & 20 CFR §§ 404.1527(a)(1) and 416.927(a)(1)). Because the ALJ found "Plaintiff's daily activities were inconsistent with the limitations Ms. R. suggested," the Commissioner argues "[the] counseling records have little probative value."   Id. (referencing AR at p. 36).   "Based on the voluminous evidence of record as a whole, including the materials from Ms. R. that are in the record, the findings of the state agency medical consultants, and the April 2018 consultative examination report from Dr. Gilbertson," the Commissioner believes "there was sufficient evidence of record for the ALJ to make an informed determination as to Plaintiff's disability status."   Id. at p. 15 (referencing Dozier v. Heckler, 754 F.2d 274, 276 (8th Cir. 1985)).

In reply, plaintiff argues the ALJ's conclusion "Ms. R.'s evidence was not entitled to 'particular or special weight' because it was 'not a medical opinion' does not accord with . . . 20 C.F.R § 404.1527 for weighing evidence provided by a mental health therapist."   (Docket 36 at pp. 10-11).   Plaintiff points out that

Ms. R. was a licensed professional counselor with 16 years of experience.   Id. at p. 11 (referencing Docket 24 ¶ 161).   Plaintiff points out that before issuing a medical source statement on June 27, 2016, Ms. R. saw plaintiff on a weekly basis since December 11, 2015.   Id. (referencing Docket 24 ¶¶ 162-172, 178, 181-82, 184-85, 189-90, 193-95, 197, 200 & 268-82).

Because the ALJ criticized Ms. R. for not referring plaintiff to a mental health provider, plaintiff submits that criticism disclosed the ALJ was mistaken about Ms. R.'s professional status.   Id.   Finally, plaintiff contends the ALJ's determination "that Plaintiff's daily activities were greater than [Ms.] R.'s description, is completely unsupported by the record."   Id. at p. 12.

The ALJ found Ms. R. did not qualify as "an acceptable medical source." (AR at p. 36).   The ALJ gave Ms. R.'s assessment "minimal weight."   Id.   The ALJ identified four reasons for discounting the weight to be given to the therapist's mental assessment.

> While the counseling records from December 2015 to June 2016 include evidence of a variable mood with signs of both depression and anxiety, a number of other examinations that were conducted by acceptable medical sources, from before and after the claimant began counseling, included observations of essentially normal moods, intact memory, intact concentration, and intact attention[.] [references not included]. . . .

> [T]he claimant's reported activities of daily living are inconsistent with the marked limitations in this assessment.

> [Ms. R.'s] assessment appears to be largely based on the claimant's subjective complaints and her observations, as there is no indication she reviewed any other medical records. . . .

19

[Ms. R.] did not perform any standardized tests, nor did she refer the claimant to another mental health provider despite her belief the claimant had significant mental impairments.

Id. (reformatted for convenience).

The Social Security Administration clarifies that "[t]he term 'medical sources' refers to both 'acceptable medical sources' and other health care providers who are not 'acceptable medical sources.' "  SSR 06-03P, 2006 WL 2329939, at *1.  "Acceptable medical sources" include "[l]icensed or certified psychologists.  Included are school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting, for purposes of establishing mental retardation, learning disabilities, and borderline intellectual functioning only[.]"  Id.  "In addition to evidence from 'acceptable medical sources,' " the Social Security Administration "may use evidence from 'other sources,' . . . to show the severity of the individual's impairment(s) and how it affects the individual's ability to function."  Id., 2006 WL 2329939, at *2.  "These sources include, but are not limited to . . . Medical sources who are not 'acceptable medical sources,' such as nurse practitioners, physician assistants, licensed clinical social workers . . . ."  Id.  "Information from these 'other sources' cannot establish the existence of a medically determinable impairment.  Instead, there must be evidence from an 'acceptable medical source' for this purpose.  However, information from such 'other sources' may be based on special knowledge of the individual and may

provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."   Id.

A licensed professional counsellor is "not an acceptable medical source." Burkhart v. Berryhill, No. 4:17-00932, 2019 WL 852123, at *2 (W.D. Mo. Feb. 22, 2019); Jeffery W. v. Commissioner, Social Security Administration, No. 2:18-cv-00345, 2019 WL 4167129, at *5 (D. Or. Aug. 31, 2019) (same) (citing Blodgett v. Commissioner, Social Security Administration, 534 Fed. Appx. 608, 610 (9th Cir. 2013)); Bristow v. Saul, No. 1:20-CV-00032, 2020 WL 7502455, at *6 (W.D. Ky. Dec. 21, 2020) ("Under the regulations," a licensed professional counselor associate, "is not designated an 'acceptable medical source.' ").

Section 404.1527(f)(1) of the regulations details how an ALJ must weigh opinions from non-acceptable medical sources.   That section provides:

> Opinions from medical sources who are not acceptable medical sources and from nonmedical sources may reflect the source's judgment about some of the same issues addressed in medical opinions from acceptable medical sources.

> Although we will consider these opinions using the same factors as listed in paragraph (c)(1) through (c)(6) in this section, not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source or from a nonmedical source depends on the particular facts in each case.

> Depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an acceptable medical source or from a nonmedical source may outweigh the medical opinion of an acceptable medical source, including the medical opinion of a treating source.

21

> For example, it may be appropriate to give more weight to the opinion of a medical source who is not an acceptable medical source if he or she has seen the individual more often than the treating source, has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole.

20 CFR § 404.1527(f)(1) (reformatted for convenience). "[H]owever, the ALJ is not required to apply all Section 404.1527(c) factors when considering the weight to give a non-acceptable medical source's opinion." Burkhart, 2019 WL 852123, at *2.

Even if the absent records had been considered by the ALJ, plaintiff fails to acknowledge that the absent records cannot be used to establish the severity of impairments necessary to meet or be the medical equivalent of the relevant listings at step three.

B.   Post October 2017 medical evidence

Plaintiff asserts the ALJ "failed to update the post October 2017 medical evidence." (Docket 33 at p. 37) (emphasis omitted). Plaintiff fails to identify what medical records after October 2017 were not acquired by the ALJ or how the information on those missing records impact plaintiff's burden of proof at step three.

OBJECTION 2

Plaintiff contends "[t]he ALJ's step three assessment of "B" criteria was unsupported by substantial evidence, in particular given the ALJ's failure to consider Exhibit 16F, consider the impact of periventricular white matter

22

lesions, and develop the counseling evidence."   Id. at p. 38 (some capitalization omitted).

For the period 2007 through October 2013, the ALJ in 2019 relied on the 2013 testimony of Dr. Atkins.

> During the hearing held January 25, 2013, Dr. Atkins provided medical expert testimony. Based on his review of the record, he concluded that the claimant's mental impairments were nonsevere, causing no limitations in any of the "paragraph B" criteria.  This opinion is consistent with the lack of significant mental health treatment from that period and with the State agency medical consultant assessments.

(AR at p. 35).   The ALJ assigned "significant weight to Dr. Atkins' testimony regarding the period from January 1, 2007 through October 27, 2013."   Id.

For the October 28, 2013, through October 25, 2016, period, the ALJ relied on the July 2016 testimony of Dr. Pelc.

> Considering all the evidence of record and construing it in a light most favorable to the claimant, the undersigned finds that the medical expert testimony of Dr. Pelc from July 2016 is more consistent with the claimant's mental health treatment history in 2015 and 2016 for persistent symptoms of depression and anxiety/panic.

Id.   The ALJ found:

> Dr. Pelc supports finding severe mental impairments for the period from October 28, 2013 through October 25, 2016. . . Dr. Pelc opined that [prior to 2015] claimant had the ability to remember simple work-like procedures, to understand, remember, and carry out very short and simple instructions, to maintain attention and concentration for extended periods of time in order to perform simple, repetitive work activity, to perform activities with a schedule, maintain regular attendance, and be punctual within customary tolerances for simple tasks, and to sustain an ordinary routine without special supervision. . . .

23

[A]fter 2015, she was unable to work in coordination with others without being distracted by them due to increased social avoidance and withdrawal. . . . [C]laimant had the ability to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest breaks in order to process simple information, provided she had no more than occasional contact with others. . . . [S]he was limited to having brief, superficial contact with members of the general public, and had the ability to get along with co-workers without distracting them or exhibiting extremes on a brief, limited basis.  She was able to maintain socially appropriate behavior, and to adhere basic standards of neatness and cleanliness. . . . [S]he was able to ask simple questions and request assistance, to accept instructions and respond appropriately to criticism from supervisors on an infrequent and limited basis, to respond appropriately to changes in a simple work setting, to be aware of hazards and take appropriate precautions, and set realistic goals and make plans independently of others.

Id. at pp. 35-36.   The ALJ gave "significant weight" to his opinions for "the period from October 28, 2013 through October 25, 2016," because his "testimony is reasonably consistent with the cognitive testing results from November 2013 and with the medication management and counseling records from 2015 and 2016."   Id. at p. 36.

After October 26, 2016, the ALJ found "the more recent consultative examination report from [Dr. Gilbertson, April 2018], the lack of counseling records after June 2016, and the claimant's [November 13, 2018,] testimony . . . all indicate improvement in the claimant's mental health to the point that her medically determinable mental impairments no longer cause more than mild limitations in any of the 'paragraph B' criteria[.]"   Id.

24

On April 4, 2018, Dr. Gilbertson conducted a psychological consultative examination to assist with a determination of disability benefits eligibility. (Docket 24 ¶ 299).   No records were provided for the psychologist's review.   Id.   Plaintiff described her social and medical history.   Id.   Other than the few history and physical comments noted in Dr. Gilbertson's chart, the parties acknowledge "[t]he remainder of [plaintiff's] social and medical history was reported consistent with other reports."   Id.

"On mental status exam," Dr. Gilbertson found plaintiff's "attitude was downtrodden and pessimistic."   Id. ¶ 302.   While expressing "significant concern over her limitations," Dr. Gilbertson noted plaintiff "was pleasant, cooperative, and easily engaged."   Id.   Despite her complaints of pain, Dr. Gilbertson observed plaintiff "did not display pain behavior, specifically no shifting in her chair, no standing up, and no reports of pain."   The doctor noted plaintiff's "[m]ood and affect were pervasively depressed. . . . Affect was pervasively flat throughout the evaluation.   Mental Grasp: Marginal.   Insight. Marginal."   Id. ¶ 303.

Dr. Gilbertson charted plaintiff's "ability to handle stress appeared somewhat poor and [plaintiff] reported becoming very anxious when under stress."   Id. ¶ 304.   But, the doctor noted that "[d]uring the session [plaintiff] was able to interact and maintain appropriate behavior."   Id.   Dr. Gilbertson

administered no tests, but identified plaintiff's "DSM-IV considerations were

Major Depressive disorder - recurrent . . . . Axis V 70."[8]   Id. ¶ 306.

Dr. Gilbertson opined that plaintiff's "ability to understand, remember and

carry out instructions was not affected. . . . [Plaintiff's] ability to interact

appropriately with the public and supervisors was mildly affected[] [and her]

[a]bility to interact appropriately with co-workers, and to respond to changes in

routine work settings was not affected."   Id. ¶ 307.

Plaintiff has no treating psychiatrist, psychologist or other qualified

mental health care provider who addresses the impact of her mental

impairments.   The ALJ is entitled to rely upon the examination and report of Dr.

Gilbertson.   The psychologist's opinions are supported by non-examining

consultative psychologist, Dr. Pelc, and the record as a whole.   Again, were the

absent records of Ms. R. considered by the ALJ at step three, Ms. R.'s

consultation notes and mental status report cannot be used to determine the

severity of plaintiff's impairments at step three.

---

[8]The "70" refers to global assessment of function ("GAF") score of "70." GAF is a numeric rating, on a scale of 0 to 100, used to rate subjectively an individual's "overall level of functioning" by rating symptom severity and social, occupational, or psychological functioning. See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, "Axis V: Global Assessment of Functioning" at Axis V: Global Assessment of Functioning" at *34 (DSM-IV-TR 2000).   Where the symptom severity and level of functioning are discordant, the GAF rating reflects the worst of the two.   Id.   GAF ratings represent current levels of functioning "because ratings of current functioning will generally reflect the need for treatment or care."   Id.   "A [GAF] score of 61 to 70 indicates some mild symptoms but generally functioning pretty well with some meaningful interpersonal relationships."   Symes v. Colvin, No. 14-CV-04127, 2015 WL 4041680, at *2 n.7 (D.S.D. July 1, 2015) (internal citation omitted).

Plaintiff bears the burden of proof at step three.   <u>Shalala</u>, 38 F.3d at 1024. Plaintiff failed to show the conclusion of the ALJ at step three is not supported by the substantial evidence in the record.   42 U.S.C. § 405(g); <u>Choate</u>, 457 F.3d at 869; <u>Howard</u>, 255 F.3d at 580.   The ALJ's findings are conclusive because they are "supported by substantial evidence."   42 U.S.C. § 405(g).   The court finds the ALJ did not err at step three of the sequential evaluation.   <u>Kirby</u>, 500 F.3d at 707.

**<u>STEP FOUR</u>**

Before considering step four of the evaluation process, the ALJ is required to determine a claimant's residual functional capacity ("RFC").   20 CFR §§ 404.1520(e).   RFC is a claimant's ability to do physical and mental work activities on a sustained basis despite any limitations from his impairments. 20 CFR §§ 404.1545(a)(1).   In making this finding, the ALJ must consider all of the claimant's impairments, including those which are not severe.   20 CFR §§ 404.1545(e).   All of the relevant medical and non-medical evidence in the record must be considered.   20 CFR §§ 404.1520(e) and 404.1545.

"The ALJ should determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his] limitations."   <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 887 (8th Cir. 2006) (quoting <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1070 (8th Cir. 2004)); <u>see</u> <u>also</u> <u>Cox v. Astrue</u>, 495 F.3d 614, 619 (8th Cir. 2007) (because RFC is a medical question, the ALJ's decision must be

27

supported by some medical evidence of a claimant's ability to function in the workplace, but the ALJ may consider non-medical evidence as well); Guilliams, 393 F.3d at 803 ("RFC is a medical question, and an ALJ's finding must be supported by some medical evidence."). The ALJ "still 'bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence.'" Id. (citing Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000)).

"In determining RFC, the ALJ must consider the effects of the combination of both physical and mental impairments." Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004) (citing Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003)). As stated earlier in this discussion, a severe impairment is one which significantly limits an individual's physical or mental ability to do basic work activities. 20 CFR § 404.1521(a).

The ALJ found plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR at p. 30).

Plaintiff challenges the ALJ's credibility finding. (Docket 33 at pp. 39-47). She claims "[t]he ALJ . . . found [plaintiff] inconsistent (i.e., not credible), based on an inference stacked on inference. The ALJ inferred that there was no medical evidence after September 2017—the ALJ inferred that the frequency and

28

extent of treatment was not comparable with her complaints, OR that she failed to follow prescribed treatment[.]"   Id. at p. 41 (capitalization in original). Plaintiff further contends "[t]he ALJ mischaracterized [plaintiff's] activities of daily living ["ADLs"].   Overwhelming evidence was that her ADLs were never at the level found by the ALJ and were progressively more limited."   Id. at p. 43 (referencing Docket 24 ¶¶ 231-39, 250 & 254-60).   In plaintiff's view, M.H., plaintiff's "housemate, corroborated the limitations and functional level described by [plaintiff]."   Id. at p. 44 (referencing Docket 24 ¶¶ 240-46).   When assessing plaintiff's ADLs, she argues the ALJ "fell far short of [the applicable] standard."   Id. at p. 45 (referencing Wagner, 499 F.3d at 849; Reed, 399 F.3d at 923).

Plaintiff also asserts the ALJ erred by relying "upon supposed failure to seek medical treatment[.]"   Id. (AR at p. 34).   Plaintiff submits

> [t]he ALJ's findings of fact had too tenuous a relationship with the evidence of record, to support this conclusion. . . . [The ALJ] failed to consider Dr. W.'s 2003 evidence and Exhibit 16F,[9] failed to develop the counseling evidence and obtain treatment records after September 2017, and grossly mischaracterized the claimant's consistent descriptions of disabling symptoms and limitations in numerous questionnaires, and dozens of medical reviews.

Id. at p. 46.

---

[9]"In March 2018," plaintiff's counsel "submitted medical evidence from March 2001 to April 2003, including, for the first time, an April 9, 2014 rheumatological evaluation and diagnosis of fibromyalgia by Dr. W. (Ex. 16F [] . . . ."   (Docket 24 ¶ 12).

In response, the Commissioner submits "[t]he ALJ considered a number of relevant factors in evaluating Plaintiff's symptoms."   (Docket 35 at p. 17).   In the Commissioner's view those factors were:

> Plaintiff's testimony and her reported precipitating and aggravating factors . . . .
>
> Plaintiff's daily activities . . . . included driving, shopping, and caring for pets . . . . [her ability] to drive and take care of her activities of daily living . . . .
>
> Plaintiff received conservative treatment . . . .
>
> Plaintiff's medications . . . .
>
> [T]he observations of physicians and others . . . . Dr. C.'s observation that there was a positive Waddell's sign of weakness that was overcome with distraction . . . . B.B., D.O., concluded that many of Plaintiff's complaints were mechanical in nature . . . . Dr. S. found no neurological basis for her symptoms . . . . [and] opined that some of her symptoms may be non-physiologic . . . .
>
> [I]n September 2015, L.W.H., Psy.D., opined that she had concerns about the validity of test results given the indicators of inadequate effort and noncredible reporting of somatic symptoms and memory problems . . . . [and] told Plaintiff and M.H. that if the test results were valid, Plaintiff would not be able to live independently, but based on observation this was not the impression of Dr. L.W.H. . . . . Plaintiff and M.H. agreed . . . . Dr. L.W.H. noted that Plaintiff had not consistently followed through on the recommendation to engage in mental health treatment on a consistent basis . . . .

Id. at pp. 18-19.   While admitting "the ALJ's decision is not accurate to the extent [the decision] indicates that Plaintiff stopped seeing her counselor[,]" the Commissioner asserts the "inaccuracy does not establish reversible error" because the ALJ found the counselor's records were of "little probative value" and were given "little weight."   Id. at p. 19.   "Based on the evidence of record as a

whole," the Commissioner argues "substantial evidence supports the ALJ's decision."   Id. at p. 20.

In reply, plaintiff contends the ALJ selectively picked parts of Dr. L.W.H.'s neurological report, ignoring other significant portions of the doctor's findings. (Docket 36 at p. 13) (referencing Docket 24 ¶¶ 146-59).   For the impairments in this case, plaintiff wonders what kind of more aggressive treatment the Commissioner would expect or require as plaintiff "received extensive treatment and consultations by rheumatologists, neurologists, two neuropsychologists, a physiatrist, and physical therapists, in addition to regular care by her primary care physicians."   Id. at p. 14.   While currently prescribed Cymbalta,[10] Seroquel[11] and Lyrica,[12] plaintiff reminds the court that "[o]ver the course of years of unsuccessful treatment [she] was prescribed at least 20 medications

---

[10]"Cymbalta (duloxetine) is a selective serotonin and norepinephrine reuptake inhibitor antidepressant (SSNRI). Duloxetine affects chemicals in the brain that may be unbalanced in people with depression. Cymbalta is used to treat major depressive disorder in adults. It is also used to treat general anxiety disorder in adults . . . ." https://www.drugs.com/cymbalta.html. See also Docket 33-1 at p. 1.

[11]"Seroquel (quetiapine)" is an atypical antipsychotic used to change the actions of chemicals in the brain and is used to relieve symptoms such as delusions, hearing voices, hallucinations, or paranoid or confused thoughts typically associated with some mental illnesses.   It may be used to treat the symptoms of schizophrenia or a psychotic episode; in the treatment of severe depression; severe agitation or anxiety; or for stabilizing episodes of mania in people with Bipolar Disorder."   https://www.drugs.com/seroquel.html.   See also Docket 33-1 at pp. 2-3.

[12]"Lyrica is used to treat pain caused by fibromyalgia, or nerve pain in people with diabetes (diabetic neuropathy), herpes zoster (post-herpetic neuralgia), or spinal cord injury." https://www.drugs.com/lyrica.html.   See also Docket 33-1 at p. 2.

. . . . [Which] [t]he ALJ did not consider . . . in the context of credibility/ consistency."   Id. (referencing Docket 33-1).

Plaintiff contends "Dr. C.'s extensive record of treatment and reports of observations and medical investigation from November 2011 . . . . until Dr. C. moved out of the area [in September 2013] . . . [show the doctor] took her patient's symptoms and limitations seriously."   Id. (referencing Docket 24, 58-64, 66-68, 80-86 & 96-97).   Regarding Dr. S.'s findings, plaintiff points out the neurologist charted she "had continuing multiple somatic and neurologic symptoms of uncertain cause, and her fibromyalgia appeared to be a contributing factor but her mental illness appeared significant."   Id. at p. 15 (referencing Docket 24 ¶ 127).

Plaintiff argues the Commissioner's contention the ALJ's shortcomings were harmless errors is itself in error because "[t]he ALJ found that the absence of counseling reports (even though the ALJ had notice of their existence) meant that Plaintiff did not have a psychological impairment beginning the month after the last counseling report in the record."   Id. at p. 17.

 The court is to "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.' "   Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007) (quoting Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001)).   But when the record detracts from that decision, the court must determine whether the ALJ's decision is supported by substantial evidence.   Reed, 399 F.3d at 920.

It is very disconcerting to the court the ALJ knew during the November 2018 hearing that plaintiff was still in counseling.   Plaintiff drove from Custer to Rapid City "to an appointment that I have every Friday with a counselor."   (AR at p. 1670).   Later during the hearing, the ALJ was reminded the counselor took notes during each session.  Id. at 1680.   Instead of getting the counselor's notes, the ALJ asked plaintiff, who was appearing pro se at the hearing, to get the counselor's records.   Id.

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press [her] case." Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004).   "The ALJ possesses no interest in denying benefits and must act neutrally in developing the record." Id.   It is an error which distracts from the ALJ's credibility assessment to declare the "lack of treatment records after September 2017 do not wholly support the claimant's subjective complaints." (AR at p. 34).   The ALJ cannot make that statement without reviewing the records which the ALJ knew existed.

It is further troubling to the court the ALJ used plaintiff's activities of daily living as justification to give even less weight to plaintiff's testimony.

> At the hearing held November 13, 2018, the claimant testified that her pain is exacerbated by sitting or standing for extended periods or being exposed to cold weather. When asked about specific limitations, the claimant testified that she felt able to walk about 50 yards at a time, stand about 10 minutes at a time, lift a maximum of 30 pounds, and carry a maximum of about 11 pounds.   She also stated that she is able to reach, stoop, and crouch with some unsteadiness.   As for activities of daily living, the undersigned finds

33

that the claimant's reported activities of daily living are not as limiting as one would expect from an individual alleging complete disability.

(AR at pp. 29-30).   However, plaintiff's testimony revealed a significantly different view of her abilities.

I could go [shopping] for a little while, but I got to the point where it just wasn't even worth it.   (AR at p. 1686).

I wake up in the night because I'm in too much pain and so I got to move around a lot and I've got all these pills that I use to try to position myself so that I can try to sleep.   So I'm usually get out of bed because I'm in pain.   Id.

I'll feed the dogs, make myself a shake, a protein shake.   And then I will go out and I'll feed the chickens and the cats.   Id.
[S]ometimes I'll get a load of laundry going.   I try to put the dishes in the dishwasher.   Sometimes I clean eggs.   Id. at p. 1687.

I'm actually afraid of the stove now because twice I've left the burner on with something going and so that's got me a little afraid, but so now I'm just more like maybe throw something in the microwave or a Crockpot.   Id.

I remember doing some laundry and vacuuming.   But after doing those things, then I suffer a lot.   It takes you know, sometimes it can take a few days for that—for the pain caused by overdoing to mellow out.   Id. at p. 1688.

I'm talking like I might clean one little area, try to.   I start a lot of things that I can't finish.   Id. at p. 1689.

I'll put dishes in the dishwasher.   There's usually not too many. . . . M.H. tends to help me out with some of the things that I really don't like to do: And part of that is because of the bending over.   It's just hard on my legs and my back, bending over is just one of the things I really hate.   Id. at pp. 1689-90.

[Mopping or scrubbing toilets, bathroom floor, kitchen floor, or showers, tubs?] No, not really . . . . not on a regular basis like maybe once in a while I'll get a little idea in my head and think I should do this and then I'm like oh, yeah, this is why I can't because it's not

34

going to get finished because I'll be in too much pain[.]   Id. at
p. 1690.

[T]here's a riding lawnmower that I can use . . . There's a lot of
bouncing around on that thing, so it—I'm not able to do it for a
whole well maybe a half-hour at a time. . . . usually somebody has to
finish it for me.   Id.

[Paying bills or handling finances?] I tried and I started making
mistakes, so I just told M.H. to just—she did a better job[.]   Id.

I go to church with my mom, M.H., me, my uncle we all go to church
on Saturday.   Id. at p. 1691.

[How long can you stand at any one time?] [B]efore the pain kicks in
so bad or I force myself to sit down.   I don't know.   Usually if I'm
standing and working on something, it's within the first five or ten
minutes that it's like oh my goodness.   Id. at pp. 1695-96.
Maybe [walk] half of a football field.   Id. at p. 1696.

I might be able to lift 30 pounds, but not you know over and over
because like the chicken food [interrupted by ALJ].   Id.

[Could she lift 20 pounds over and over?] I don't know . . . . I would
say five pounds maybe because it's going to start pulling on the
muscles and then they start feeling like they're ripping and it's
just—it can be pretty painful.   Id. at p. 1697.

[May be able to carry her] 11 or 13 pound [dog across a room].   Id.

[Able to stand, bend at the waist and touch the floor?] No.   Id. at
1699.

[Squatting to look at the bottom shelf of the refrigerator?] If I want to
lose my balance, probably.   Id.

The ALJ sought to support her conclusions with plaintiff's 2012 function

report.   Id. at p. 30.   "In a function report, the claimant reported the ability to

handle all personal care, prepare meals, perform several household chores, care

for pets, drive, shop in stores, handle finances, read, watch TV, sew, and attend

35

church two to three times per month.   Id. (referencing Exhibit 5E).   Yet, the

JSMF describes how that function report is not as supportive of the ALJ's

conclusion regarding plaintiff's abilities.

> A friend helps give dogs food and water when I can't.  She takes
> them for a walk.  [Before her illness or condition] she stated that
> she was able to ride a bicycle, go for walks, cook, bake, go for hikes,
> shop, laundry, clean house, mow, garden, baby sit nieces and
> nephews, and fix things.   Asked about her sleep, she stated: I never
> get rested, too much pain.  Very difficult to get situated so I can
> sleep.   Asked about personal care, she stated: I am careful
> (dressing) so I don't lose my balance.  I shower 2-3 times a week
> instead of everyday like I used to.   I use a shower stool to sit on to
> shave my legs.
>
> Asked if she needed reminders taking medicine, she stated: I use a
> weekly, twice a day, container.   Asked if she prepared her own
> meals, she stated: p.b. & jelly, frozen mac & cheese, yogurt, fruit,
> cottage cheese, cold cereal.  Takes 5 minutes or less.  I don't bake
> or cook because it's difficult.  Asked about house and yardwork,
> she stated: I rarely clean house. I can't push a mower.
> Housecleaning takes all day.  I do one load of laundry a couple
> times a week.  Someone carries it downstairs for me.  My friend
> helps clean the house. I can vacuum a little.  It makes me feel
> exhausted & causes pain in my back & legs.
>
> Asked to explain why not, she stated: it causes a lot of pain in my
> legs & back.  Also my legs are weak.  Go outside daily for a few
> minutes.  Asked how she traveled and shopped, she stated: drive
> and ride in a car.  Can go out alone but I don't.  I don't like to go
> alone because I'm afraid.  Drive but not a lot.  Shop in store and by
> computer for groceries, necessities.  Shop once a week I can go to
> one store then I'm exhausted.  It takes an hour or so.  I always
> have someone with me.  I use the store's wheelchair to get through
> the store.  Asked about money management she stated that she
> was able to pay bills, handle a savings account, count change, and
> use checkbook. . . .
>
> "I have made a few mistakes with my checkbook—I feel sometimes
> too fatigued to do it."   Hobbies and interests were reading, some TV,
> sew when I can, being with the dogs & with my mom & a friend.
> How often/well?  She stated, I read for about 20 minutes or so.  I

sew when I can, not very often due to my illness.   I must struggle at everything I try to do.   I can't do the things I like.   Asked about social activities, [she] said: Visit on the phone, see my mom & friend daily.   Church 2-3 times a month.  She needed someone to accompany her.

(Docket 24 ¶¶ 233-36).

Between the ALJ's judging plaintiff's credibility in the absence of further counseling after 2017 and the biased interpretation of plaintiff's testimony and functional report, the court finds the ALJ's credibility determination for plaintiff is not supported by substantial evidence.   The case must be remanded for a proper determination of plaintiff's credibility in light of the analysis in this order.

The Commissioner is reminded that being able to do some limited activities of daily life should not impact credibility.   "[T]he ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work."   Halverson v. Astrue, 600 F.3d 922, 932 (8th Cir. 2010) (internal quotation marks omitted) (quoting Reed, 399 F.3d at 923-24)   See also Hogg v. Shalala, 45 F.3d 276, 278-79 (8th Cir. 1995) (same) (citing Harris v. Secretary of DHHS, 959 F.2d 723, 726 (8th Cir. 1992) ("The fact that a claimant . . . cooks, cleans, shops, does laundry, and visits friends does not in and of itself constitute substantial evidence that a claimant possesses the residual functional capacity to engage in substantial gainful activity.") and Thomas v. Sullivan, 876 F.2d 666, 669

(8th Cir. 1989) ("a claimant need not prove she is bedridden or completely helpless to be found disabled. . . . The ability to do light housework with assistance, attend church, or visit with friends on the phone does not qualify as the ability to do substantial gainful activity.").

It must be pointed out that the ALJ improperly discredited the testimony of M.H.   The ALJ held:

> The statements from M.H. do not establish that the claimant is disabled.   Since she is not medically trained to make observations as to dates, frequencies, types and degrees of medical signs and symptoms, or the frequency or intensity of unusual moods or mannerisms, the accuracy of the statements is questionable. Furthermore, because of her relationship with the claimant, she cannot be considered a disinterested third party whose testimony would not tend to be colored by affection for the claimant, as she would have a natural tendency to agree with the symptoms and limitations the claimant alleges.   More importantly, significant weight cannot be given to the statements because they are inconsistent with the preponderance of the opinions and clinical observations, as discussed and cited above.

(AR at pp. 37-38).

Whether considered just a friend or a housemate, M.H. has known plaintiff for 13½ years.   (Docket 24 ¶ 240).   She is a nurse at Regional Hospital, now Monument Health, in Rapid City, South Dakota.   (AR at p. 1669).   Without detailing the report and observations of M.H. here, she provides a comprehensive and articulate report of her observations and opinions regarding plaintiff.   See Docket 24 ¶¶ 240-46.

As the court previously noted:

> [T]he regulations encourage an ALJ to seek the testimony of family members because they have the most frequent contact and exposure

38

to the claimant's physical and mental impairments.   <u>See</u> 20 CFR
§§ 404.1512(b)(1)(iii) . . . and 404.1513(d)(4) . . . . Consideration of
third party statements also must be considered when an ALJ is
evaluating a claimant's pain.   <u>See</u> 20 CFR § 404.1529(a).

<u>Dillon v. Colvin</u>, 210 F. Supp. 3d 1198, 1207 (D.S.D. 2016).

"Evidence includes . . . [s]tatements . . . others make about your

impairment(s), your restrictions, your daily activities, your efforts to work, or any

other statements you make to medical sources during the course of examination

or treatment, or to us during interviews, on applications, in letters, and in

testimony in our administrative proceedings . . . ."   20 CFR § 404.1512(b)(1)(iii).

"In addition to evidence from the acceptable medical sources . . . . [the agency]

may also use evidence from other sources to show the severity of your

impairment(s) and how it affects your ability to work. Other sources include, but

are not limited to . . . . Other non-medical sources (for example, spouses, parents

and other caregivers, siblings, other relatives, friends, neighbors, and clergy).

. . ."   20 CFR § 404.1513(d)(4).

Family members "always have a stake in the claim" because it is their

child, spouse or other family member who is seeking Social Security benefits.   If

this relationship was a valid basis for rejecting the testimony of a family member,

the regulations would specifically direct an ALJ to disregard the statements and

observations of these individuals.   To the contrary, the regulations encourage

an ALJ to seek the testimony of family members because they have the most

frequent contact and exposure to the claimant's physical and mental

impairments.

Simply put, the nature of the medical condition and the nature of
the life activities, including such considerations as independence,
should be considered against the backdrop of whether such

> activities actually speak to claimant's ability to hold a job.
> Participation in activities with family or activities at home and at
> "your own pace" may not reflect an ability to perform at work.

Nowling v. Colvin, 813 F.3d 1110, 1121-22 (8th Cir. 2016).

M.H.'s report describes her housemate's conditions and limitations in vivid detail.   Failure to consider [her] testimony is contrary to the regulations. 20 CFR §§ 404.512(b)(1)(iii), 404.1513(d)(4), and 404.1529(a).   The conclusion to give her testimony little or no weight is not supported by substantial evidence and the ALJ did not provide good reasons for discounting the testimony.   In addition, the refusal of the ALJ to consider her description of plaintiff's activities of daily living impact both plaintiff's credibility and the step four analysis of establishing a residual functional capacity ("RFC") for her.

The court has no confidence in the remainder of the ALJ's decision. Snead, 360 F.3d at 839.   The evidence not appropriately considered by the ALJ detracts from the decision to deny disability benefits.   Reed, 399 F.3d at 920.

## ORDER

Based on the above analysis, the court finds the matter should be remanded for further proceedings consistent with this order.   Good cause appearing, it is

ORDERED that plaintiff's motion to reverse the decision of the Commissioner (Docket 32) is granted.

Dated March 24, 2021.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE

40